**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Angelo Antonio Bellia Castillo, | |
| *Plaintiff*, | |
| v. | No. 26 CV 6843 |
| Sam Olson, Immigration and Customs Enforcement and Removal Operations Field Office Director, *et al.*, | Judge Lindsay C. Jenkins |
| *Defendants*. | |

**MEMORANDUM OPINION AND ORDER**

For the last four years, Angelo Antonio Bellia Castillo has been playing by the rules. He came to the United States after fleeing persecution in Venezuela based on his opposition to the Venezuelan government. [Dkt. 1, ¶ 1.] He entered without inspection on September 5, 2022 and, the following day was granted humanitarian parole under 8 U.S.C. § 1182(d)(5), a mechanism reserved for "urgent humanitarian reasons or significant public benefit." Documentation from that encounter indicates that the Department of Homeland Security granted Bellia Castillo parole "due to detention capacity at the Eagle Pass North Sub-Station." [Dkt. 7-1.] Since then, Bellia Castillo has lived in the United States, complying with all requirements of his parole. [Dkt. 1, ¶ 2.] He has no criminal record and has applied for asylum, withholding of removal, and relief under the Convention Against Torture. [*Id.*, ¶¶ 2, 5.]

Things changed, however, on June 10, 2026. While he attended a routine ICE check-in that day, DHS arrested Bellia Castillo. [*Id.*, ¶ 3.] Simultaneously, the Department served him with (1) an I-200 Warrant for Arrest of Alien Arrest pursuant to Sections 236 and 287 of the Immigration and Nationality Act, (2) a letter terminating his parole, and (3) a Notice to Appear. [*Id.*; dkt. 1-3.] Bellia Castillo remains in immigration detention while DHS carries out removal proceedings against him. He has not had an opportunity for a bond hearing. [Dkt. 1-1, ¶¶ 4, 12.]

Maintaining that his detention and parole revocation violate the INA, the APA, and the Due Process Clause of the United States Constitution, Bellia Castillo filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 in this court. His petition is granted. The court orders Respondents to provide Bellia Castillo with a bond hearing within five days or release him from custody.

1

## I.      Statutory Background

Respondents contend that Bellia Castillo is subject to mandatory detention under 8 U.S.C. § 1225. Bellia Castillo, for his part, asserts that his four-year, lawful presence in the United States brings him outside the parameters of § 1225 and permits his release on bond pending his removal proceedings pursuant to § 1226. The court begins with a brief overview of the relevant statutes.

### A.      Detention Pursuant to Section 1226

Section 1226(a) sets out the "default rule" for the discretionary detention of noncitizens "already present in the United States." *Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018); *Nielsen v. Preap*, 586 U.S. 392, 395 (2019) ("Aliens who are arrested because they are believed to be deportable may generally apply for release on bond or parole while the question of their removal is being decided."). Under § 1226(a), immigration authorities may make an initial determination as to detention, but noncitizens may then request a bond hearing before an Immigration Judge. 8 C.F.R. §§ 1236.1(c)(8), (d)(1). At that hearing, the noncitizen "may secure his release if he can convince the officer or immigration judge that he poses no flight risk and no danger to the community." *Nielsen*, 586 U.S. at 397–98 (citing 8 C.F.R. §§ 1003.19(a), 1236.1(d); *Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006)).

### B.      Mandatory Detention Under Section 1225(b)

Article 8, Sections 1225(b)(1) and (b)(2) of the United States Code impose mandatory detention for certain "applicants for admission" into the United States. An "applicant for admission" is a noncitizen "present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). While somewhat counterintuitive, a noncitizen can be an "applicant for admission" to the United States while present, lawfully or unlawfully, in the United States. See *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 293 (E.D.N.Y. 2025). But not all "applicants for admission" are subject to mandatory detention under § 1225.

Section 1225(b)(1) allows for expedited removal proceedings and "governs noncitizens: (1) who are inadmissible for lack of proper entry documents or because they engaged in fraud or a willful misrepresentation of a fact on their application for admission; and (2) who fall within either the 'Arriving Aliens Provision' or the 'Designation Provision.'" *Rodriguez-Acurio*, 811 F. Supp. 3d at 293.[1] Section 1225(b)(2), on the other hand, applies to an "applicant for admission" who is "seeking admission" and not "clearly and beyond a doubt entitled to be admitted." "Admission" is defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

---

[1]      Respondents do not contend that Bellia Castillo falls under § 1225(b)(1) so the court omits discussion of the Arriving Aliens Provision and Designation Provision.

With the exception of a grant of humanitarian parole under 8 U.S.C. § 1182(d)(5)(A), those detained under § 1225(b)(2) must remain in immigration detention until the conclusion of removal proceedings, and those detained under § 1225(b)(1) who claim a credible fear of persecution must remain in detention until immigration officers consider their application for asylum. See *Jennings*, 583 U.S. at 297.

### C.     Section 1182(d)(5)(A): Humanitarian Parole

Section 1182(d)(5)(A) allows, "on a case-by-case basis," the Secretary of Homeland Security to parole a noncitizen applying for admission into the United States for "urgent humanitarian reasons or significant public benefit." A grant of humanitarian parole "shall not be regarded as an admission" of the noncitizen, however, and "when the purposes of such parole…have been served," the noncitizen shall "return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

By regulation, DHS may terminate humanitarian parole either "automatically" or "on notice." 8 C.F.R. § 212.5(e)(1), (e)(2). Among other ways, a grant of parole terminates automatically, without written notice, "at the expiration of the time for which parole was authorized." *Id*. § 212.5(e)(1)(ii). In all other cases, parole "shall be terminated upon written notice to the alien." § 212.5(e)(2)(i). And when "a charging document is served on the alien, the charging document will constitute written notice of termination of parole." *Id*.

While a grant of humanitarian parole does not constitute an "admission," a parolee's "physical presence within the United States cannot be said to be unlawful or illegal because it is authorized by the Attorney General, and parole has long been understood to constitute lawful status." *United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019); *United States v. Al Sabahi*, 719 F.3d 305, 309 (4th Cir. 2013) (explaining that, under 27 C.F.R. § 478.11, noncitizen is "not illegally or unlawfully in the United States if [he or she is] in valid parole status"); *Suarez-Lugo v. Bondi*, 819 F. Supp. 3d 653, 661 (S.D. Tex. 2026) ("[A] § 1182(d)(5)(A) parolee is considered to be lawfully present in the United States."). Indeed, once a noncitizen is granted humanitarian parole, they may lawfully (1) be eligible to access certain federal public benefits, 8 U.S.C. §§ 1611(a), 1641(b)(4); (2) seek an employment authorization, 8 C.F.R. § 274a.12(c)(11); and in some circumstances, (3) apply for adjustment of status through 8 U.S.C. § 1255(a).

## II.    Analysis

### A.    Bellia Castillo's Parole was Unlawfully Revoked.

Bellia Castillo argues that Respondents violated the INA, the APA, and the Due Process Clause when they revoked his parole. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. "This court reviews agency determinations with great deference." *Smith v. Garland*, 103 F.4th 1244, 1252 (7th Cir. 2024).

Under the APA, a reviewing court may set aside "final agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706. An action is an abuse of discretion if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency "must explain the evidence which is available, and must offer a rational connection between the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 52 (internal quotations omitted) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Under the *Accardi* doctrine, moreover, an agency must follow its own regulations. See *Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954).

Recall that Section 1182 allows for release on humanitarian parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The agency can terminate humanitarian parole in one of two ways. First, the parole terminates automatically if the noncitizen leaves the United States or the term of parole expires. 8 C.F.R. § 212.5(e)(1). If the parole does not terminate automatically, however, parole may only be revoked if either "the purpose for which parole was authorized" has been accomplished or a DHS official with authority decides that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." 8 C.F.R. § 212.5(e)(2)(i); 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.").

Several courts have found that non-automatic revocation of humanitarian parole requires an individualized, case-by-case determination. See, *e.g.*, *Doe v. Noem*, 778 F. Supp. 3d 311, 330 (D. Mass. 2025) (holding that agency's action was arbitrary and capricious when it failed to make an individualized determination to revoke parole); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 146 (W.D.N.Y. 2025) ("This Court agrees that both common sense and the words of the statute require

4

parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole must attend to the reasons an individual [noncitizen] received parole.") (internal citations omitted). The court finds this line of cases persuasive.

All agree that Bellia Castillo's grant of humanitarian parole came with no expiration date. The question here, then, is whether his NTA and letter of revocation provided written notice demonstrating that an authorized DHS official made an individualized determination that either (1) the purpose for which his parole was originally granted has been satisfied, or (2) neither humanitarian reasons nor public benefit warrants the continued presence of Bellia Castillo in the United States.

DHS failed to abide by these requirements when revoking Bellia Castillo's parole for multiple reasons. For starters, the agency relies on a Letter of Termination issued on June 10, 2026 (the same day as Bellia Castillo's arrest). [Dkt. 7-4.] But nothing in the record demonstrates that Bellia Castillo actually received that letter. Notably, the certificate of service contains no signature. [*Id.*]

Even assuming he received the Termination Letter, however, the court still finds it insufficient to satisfy the statutory procedural requirements. The letter states that "[n]either urgent humanitarian reasons nor significant public benefit warrant your continued parole at this time." [*Id.*] That's it. The letter does not, in other words, address Bellia Castillo's asylum petition or explain the agency's reasoning as it applies to Bellia Castillo. Nor does the letter take any position whatsoever on whether the purpose of his parole—"detention capacity at the Eagle Pass North Sub-Station"—was satisfied. [Dkt. 7-1.]

And while an NTA can serve as written notice of termination of parole, 8 C.F.R. § 212.5(e)(2)(i), the NTA at issue here provides no additional reasoning for the revocation. Indeed, the NTA fails to even acknowledge that Bellia Castillo was paroled to begin with. [Dkt. 7-2 (indicating that Bellia Castillo is "an alien present in the United States who has not been admitted or paroled").]

Because DHS provides no insight into its reasoning for revoking Bellia Castillo's parole, the court cannot assess whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43). And this court cannot infer a reasoned decision through silence. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 ("The reviewing court should not attempt itself to make up for such deficiencies: we may not supply a reasoned basis for the agency's action that the agency itself has not given.").

So, in line with the decisions of other district courts across the country, the court finds that DHS's decision to revoke Bellia Castillo's parole without a reasoned

explanation must be set aside as an abuse of discretion. See *Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1145 (D. Or. 2025) (revocation of parole was unlawful where there was "no evidence, let alone any opinion or finding" that the purpose of petitioner's parole had been served or that neither humanitarian reasons nor public benefit warranted the continued presence of the noncitizen in the United States); *Darwich v. Kemerling*, 2026 WL 170801, at *2 (M.D.N.C. Jan. 22, 2026) (holding that termination letter stating "[n]either urgent humanitarian reasons nor significant public benefit warrant your continued parole at this time" did not reflect "an individual determination"); *Francois v. Hale*, 2026 WL 472845, at *8 (D. Vt. Feb. 19, 2026) (collecting cases).

### B.      Bellia Castillo is Not Detained Under Section 1225(b).

Application of the statutory framework for detention and release pending removal proceedings has been litigated in a series of recent petitions for writs of habeas corpus. Though not unanimous, many courts have concluded that where a noncitizen is present in the United States and is detained years after entry, that person is entitled to a bond hearing in accordance with 8 U.S.C. § 1226(a). See *Barco Mercado v. Francis*, 811 F.Supp.3d 487, 494–95 (S.D.N.Y. 2025) (collecting 350 cases). Courts applying this view have relied in part on the Supreme Court's decision in *Jennings v. Rodriguez*, where the Court explained that § 1226 applies to noncitizens "already present in the United States." 583 U.S. at 303.

The Seventh Circuit has not reached a majority holding on this issue, *Castanon-Nava v. U.S. Dep't of Homeland Sec.*, 175 F.4th 828, 834 (7th Cir. 2026) (issuing three separate opinions), and circuit courts that have spoken are split, see *e.g.*, *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 498 (5th Cir. 2026) (adopting Respondents' view); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258 (11th Cir. 2026) (rejecting Respondents' view). Until the Seventh Circuit or the Supreme Court steps in, this court continues to adopt the view that noncitizens like Bellia Castillo, who entered the United States years before being detained, are not subject to § 1225 mandatory detention.

Still, Respondents say that the INA treats noncitizens present in the United States on humanitarian parole different than other noncitizens who unlawfully entered the United Sates. In doing so, they rely on § 1182(d)(5): "…such parole of such alien *shall not be regarded as an admission* of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served *the alien shall forthwith return or be returned to the custody from which he was paroled* and thereafter his case shall continue to be dealt with *in the same manner as that of any other applicant for admission* to the United States." (emphasis added). In Respondent's view, this provision means that Bellia Castillo must be treated the same as he would have been treated on the day his parole was issued. The court interprets the statute differently.

6

Start with "shall forthwith return or be returned to the custody from which he was paroled." No doubt § 1182(d)(5) authorizes DHS to take a noncitizen into "custody" upon lawful revocation of the noncitizen's parole. But what the statute does not say is equally important. And the statue does not say that the parolee shall be subject to mandatory detention under § 1225 or shall be treated as if they had never been lawfully present in the United States. See *Martinez Herrera v. Olson*, 2026 WL 561101, at *4 (W.D. Ky. Feb. 27, 2026) ("Respondents do not explain how [noncitizen-parolee] can be 'restored to the status' of 'mandatory detention.'"); *Baptiste v. Bondi*, 2026 WL 1684433 (D. Arizona May 21, 2026) ("Although the statutory language of § 1182(d)(5)(a) provides that upon expiration of parole the parolee returns 'to the custody from which [s]he was paroled,' district courts across the country have consistently held that the expiration of humanitarian parole does not require treating the noncitizen as if they had never been paroled in the first place, i.e., that they were never found to not be a flight risk or a danger to the community and that they were allowed to seek asylum in the United States") report and recommendation adopted, 2026 WL 1682149 (D. Ariz. June 10, 2026); *Abdyrakhmanov v. Baltazar*, 2026 WL 1800941 (June 23, 2026 D. Colorado) ("Respondents do not offer any argument as to the meaning of the word 'custody' as used in this provision or explain why, in their view, 'custody' is synonymous with 'status.'").

The statute's directive that humanitarian parole "shall not be regarded as admission" also does not work in Respondents' favor. Bellia Castillo doesn't argue that his parole constituted an "admission." For starters, he concedes that he's an "applicant for admission," as defined by the statute. Indeed, all parties seem to agree that he is (1) a noncitizen, (2) present in the United States, (3) who has not been admitted to the United States. Bellia Castillo also does not purport to have effectuated an "admission," which, recall, means "lawful entry…into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Nor is he "seeking admission." Quite the opposite: On account of his parole, Bellia Castillo has already been lawfully present in the United States for almost four years. He's not seeking "lawful entry," then. He's seeking permission to continue lawfully residing in the country.

The court does not overlook the potential polarity in finding that Bellia Castillo is an "applicant for admission" while, at the same time, denying that he is "seeking admission." And admittedly, the statute is less than clear on this point. But, to be sure, Congress did not define "applicant for admission" as an individual "seeking admission."[2] And reading the statute in that way would undermine the Supreme

---

[2]     Indeed, Congress does not seem to be using the term "applicant" in its usual manner. Under the statute, a person could be an "applicant for admission" even if they do not make any attempt to lawfully enter or try to remain in the United States. By way of analogy, under

Court's decision in *Jennings*, which observed that § 1226, not § 1225, applies to noncitizens "already in the country." So the court concludes that, under the current statutory scheme, Bellia Castillo—a noncitizen present in the United States for four years without having been admitted—is not seeking "lawful entry." See *Jimenez v. FCI Berlin, Warden*, 799 F. Supp. 3d 59, 71 (D.N.H. 2025) ("While an applicant for admission has not been 'admitted' to the United States, 'it does not follow that [an applicant for admission] continues to be actively "seeking" … lawful entry.'") (quoting *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 488 (S.D.N.Y. Aug. 13, 2025)).

Pivoting away from the text of the statutes, Respondents next make an argument based on a single sentence of dicta from the Supreme Court decision in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020). In that case, a noncitizen unlawfully crossed the United States border and made it 25 feet before he was arrested. *Id.* at 114. DHS initiated expedited removal under § 1225(b)(1)(A)(ii), found that the noncitizen did not have a credible fear of persecution, and signed a removal order. An Immigration Judge affirmed on *de novo* review. *Id.* The noncitizen then filed a habeas petition arguing that he "should have passed the credible fear stage," and that "immigration officials deprived him of 'a meaningful opportunity to establish his claims.'" *Id.* He also alleged that immigration officials failed to abide by various procedures and standards. *Id.* He did not, however, contend that the detention itself was unlawful. *Id.* at 115.

Emphasizing the "century-old rule regarding the due process rights of an alien seeking initial entry," the Court held that a noncitizen "in respondent's position"— "an alien detained shortly after unlawful entry"—"has only those rights regarding admission that Congress has provided by statute." *Id.* at 139–40. In rejecting the noncitizen's argument that the century-old rule became inapplicable as soon as he "set foot on U.S. soil," the Court stated "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 215 (1953)). Based on this last sentence, often referred to as the "doctrine of entry fiction," Respondents assert that the moment his parole was revoked, Bellia Castillo reverted to the exact status he possessed at the time he was paroled into the United States—a noncitizen arrested shortly after his arrival in the United States.

This argument is unpersuasive for several reasons. But because *Thuraissigiam* arose within the context of due process, the court discusses its

---

the statute's definitions, a student present on campus without having been admitted would qualify as an "applicant for admission." This is true even if the student has no plans to submit an application to attend the university. But it would not follow that the student, through his mere presence on campus, is "seeking admission," or "lawful entry," onto the campus. In other words, the statute's definitions allow for an individual to be an "applicant for admission" without actually "seeking admission."

reasoning more fully below.[3] Suffice it to say, the so-called entry fiction doctrine does not change the court's conclusion that Bellia Castillo is not subject to mandatory detention under § 1225.

The text alone places Bellia Castillo outside the confines of § 1225. But treating noncitizens detained upon revocation of humanitarian parole the same as other noncitizens "already present in the United States" also makes sounds sense. Like other noncitizens who have spent years in the United States, parolees residing in the country for years have begun to establish roots. Indeed, noncitizens on humanitarian parole are authorized by statute to establish those roots—they can apply for a change in status, obtain a work permit, and receive federal public benefits. It would defy common sense to allow noncitizens unlawfully present in the United States (who cannot take advantage of these lawful avenues for assimilating into the country) release on bail pending removal proceedings while denying that same relief to noncitizens who, up until their parole revocation, were lawfully present in the United States.

If any doubt remains, DHS's own actions suggest that Bellia Castillo was arrested pursuant to § 1226. Most telling, Bellia Castillo was arrested pursuant to a warrant. Section 1225 does not require a warrant, though. Section 1226 does. See *Martinez v. Hyde*, 810 F.Supp.3d 135, 148 n.34 (D. Mass. 2025) ("[S]ection 1226 *can* apply, notably because ICE issued warrants both times it arrested Petitioner[.] ... This is remarkable because the issuance of those warrants is consistent with detention under section 1226 but inconsistent with detention under section 1225, which does not require a warrant."). The warrant, moreover, was issued pursuant to INA § 236, codified at § 1226. [Dkt. 1-3.]

And despite now arguing that the entry fiction doctrine reverts Bellia Castillo to the status he possessed at the time he was paroled into the United States, Bellia Castillo's notice to appear doesn't reflect that he is "an arriving alien." [Dkt. 7-2.] Instead, it indicates that he is "an alien present in the United States who has not been admitted or paroled." [*Id.*] In all, these actions suggest that Bellia Castillo was arrested pursuant to § 1226, not § 1225.

---

[3] Because Thuraissigiam contested his removal (and not his detention), the Court did not consider whether he was properly subject to mandatory detention under §1225. Notably, while the government had initiated §1225 expedited removal proceedings against Thuraissigiam, the Supreme Court referenced §1226(a) when considering the practical effect of ordering his release. See *Thuraissigiam*, 591 U.S. at 119 ("Moreover, simply releasing him would not provide the right to stay in the country that his petition ultimately seeks. Without a change in status, he would remain subject to arrest, detention, and removal. §§1226(a), 1229a(e)(2)."). All to say, *Thuraissigiam* does not bear the significant weight Respondents place on it. The Court considered and decided only the narrow issue of due process rights regarding deportation afforded to a noncitizen continuously detained very shortly after unlawful entry.

9

Several district courts, too, have concluded that "mandatory-detention provisions of § 1225(b) do not apply to a noncitizen who was apprehended at the border but then granted release into the United States on humanitarian parole under § 1182(d)(5)(A)." *Bashir K. A. v. Klang*, 2026 WL 452353, at \*7 (D. Minn. Feb. 17, 2026) (collecting cases).

All told, the statutory text of the INA prohibits DHS from detaining Bellia Castillo under § 1225.

### C. Bellia Castillo's Detention Violates Due Process.

Having concluded that Bellia Castillo's detention is discretionary and not mandatory, the court turns to whether it violates due process. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

To support its argument that Bellia Castillo has limited due process rights, Respondents again rely on *Thuraissigiam*, where the Supreme Court held that a noncitizen who was still "at the threshold of initial entry," though technically in the country, could still be treated as "an alien seeking initial entry." 591 U.S. at 114 (holding that a noncitizen detained "within 25 yards of the border" is treated as if stopped at the border and had not acquired due process protections).

*Thuraissigiam* is inapplicable here for several reasons. First, the noncitizen in *Thuraissigiam* challenged his "admission," not his detention. *Id.* at 118. And it's well settled that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process Clause] protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); see also *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1170–72 (W.D. Wash. 2023) (holding that *Thuraissigiam* does not foreclose a challenge to detention); *Mata Velasquez*, 794 F. Supp. 3d at 147, 151 ("While *Thuraissigiam* forecloses the argument that [petitioner] has due process rights beyond those provided by statute concerning the process for deciding whether or not he will be admitted to this country, it does not foreclose his arguments regarding parole revocation and release."); *Rincon v. Hyde*, 2025 WL 3122784, at \*2 (D. Mass. Nov. 7, 2025) ("But the Supreme Court has never applied the entry fiction doctrine to a case like this—to constitutionally justify the detention of a person living freely, for years, within the United States— and its expansion here cannot be justified.").

Second, unlike the noncitizen in *Thuraissigiam* who was continuously detained after being arrested 25 feet from the border, Bellia Castillo has been lawfully present in the United States on humanitarian parole for the last four years. See *Yamataya v. Fisher*, 189 U.S. 86, 87 (1903) (finding a noncitizen was entitled to due process before removal despite having spent only four days in the US). His interest in liberty, then,

10

is different from a noncitizen "in [Thuraissigiam's] position [who] has only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 591 U.S. at 140.[4] Here, the relevant statute is § 1226, which allows for release on bond.

Applying the three-part balancing test set forth in *Mathews*, 424 U.S. 319, Bellia Castillo's redetention without a bond hearing violates procedural due process. He has a cognizable private interest in being freed from unlawful detention without any opportunity for a bond hearing; there is a severe risk of erroneous deprivation based on the factual record as explained above; and the government's interest is slight insofar as Bellia Castillo has been redetained without proper termination of his parole and without an individualized custody determination evaluating dangerousness and flight risk. As other courts have concluded in cases involving similar factual circumstances, his detention without a bond hearing amounts to a due process violation. See, *e.g.*, *Aviles-Mena v. Kaiser*, 2025 WL 2578215 (N.D. Cal. Sept. 5, 2025); *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274 (E.D.N.Y. 2025); *Bashir K. A. v. Klang*, 2026 WL 452353 (D. Minn. Feb. 17, 2026); *Martinez Herrera v. Olson*, 2026 WL 561101 (W.D. Ky. Feb. 27, 2026); *Torrez Arce v. Blanche*, 2026 WL 1430509, at \*1 (N.D.N.Y. May 21, 2026); *Suarez-Lugo v. Bondi*, 819 F. Supp. 3d 653, 656 (S.D. Tex. 2026); *Diaz Flores v. Leyva,* 2026 WL 1830958 (D. Utah 2026); *Baptiste v. Bondi*, 2026 WL 1684433 (D. Arizona May 21, 2026) ("The federal courts have generally determined that an individual who has lived freely in the United States under humanitarian parole since their inspection at the border, who is seeking asylum, is 'present' in the United States and does have full due process rights.").

---

[4] The cases *Thuraissigiam* cites when discussing due process rights of parolees do not help Respondents. For one, the petitioner-noncitizen in *Shaughnessy v. Mezei*, 345 U.S. 206 (1953), was never granted § 1182(d)(5) "parole." Rather, when the petitioner arrived by boat at the United States border, he was permitted to move from the boat to harborage at Ellis Island pending his removal proceedings. This type of "harborage" stands in stark contrast to today's modern humanitarian parole scheme, which grants parolees the kind of rights intended to assist with their assimilation into the country.

The petitioner-noncitizen in *Kaplan v. Tod*, 267 U.S. 228, 229 (1925), did not challenge her "detention." Because she arrived in the United States during the European war, officials suspended petitioner's deportation and "kept" her first at Ellis Island and then in the "custody" of the Hebrew Sheltering and Immigrant Aid Society, which allowed her to live with her father. Five years later, she was issued a warrant of deportation. In response, petitioner filed a writ of habeas corpus, purportedly challenging her "detention." But her petition argued that, because she had resided in the United States for the past five years, she was a United States citizen not eligible for deportation. In other words, what petitioner really challenged was her deportation, not her detention, which consisted of residing with her father.

Likewise, the petitioner-noncitizen in *Leng May Ma v. Barber*, 357 U.S. 185, 186 (1958), challenged her eligibility for withholding of deportation, not her confinement.

Notably, these cases predate the 1996 congressional overhaul of immigration statutes, which, among other changes, shifted the focus from entry to "admission."

11

### III. Conclusion

For these reasons, the court grants Bellia Castillo's habeas petition on all counts. Respondents violated the INA, the APA, and the Due Process Clause when they revoked Bellia Castillo's parole without adequate explanation, and they again violated the INA and the Due Process Clause by subjecting him to mandatory detention under § 1225. The court orders Respondents to provide Bellia Castillo with a bond hearing to assess his dangerousness and flight risk within five days or, alternatively, release him from custody.

Enter: 26-cv-6843
Date: July 1, 2026

_____
Lindsay C. Jenkins

12